| | |
|---|---|
| **TRANSPORTES PEÑÓN BLANCO SAPI DE C.V.**<br>**Av. Maestro Israel Cavazos Garza 160**<br>**Nte. Col. Jardines de la Silla**<br>**Guadeloupe, Nuevo León**<br>**México 67190,**<br><br>**GERARDO ANGEL TAMEZ TAMEZ**<br>**Chief Executive Officer and Owner**<br>**Transportes Peñón Blanco S.A. de C.V.**<br>**Av. Maestro Israel Cavazos Garza 160**<br>**Guadalupe, Nuevo León**<br>**México 67190,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**VOLVO GROUP NORTH AMERICA, LLC**<br>**7900 National Service Road**<br>**Greensboro, North Carolina 27409,**<br><br>**MACK TRUCKS, INC.**<br>**7825 National Service Road**<br>**Greensboro, NC 27409,**<br><br>**VOLVO GROUP MEXICO, S.A. DE C.V. INC.**<br>**160 Mine Lake Ct. Ste. 200**<br>**Raleigh, North Carolina 27615, and** | **No.: 1:23-cv-176** |

**VFS MEXICO, S.A. DE C.V., SOFOM, E.N.R.** )
**Avenida Santa Fe No. 495** )
**Mz B Lt B1, Piso 4, Col. Cruz Manca** )
**C.P. 05349, Alcaldía Cuajimalpa de Morelos** )
**México City, Mexico,** )
 )
      **Defendants.** )
                                           )

## COMPLAINT

1.     Plaintiffs Transportes Peñón Blanco SAPI de C.V. ("TPB") and Mr. Gerardo Angel Tamez Tamez ("Mr. Tamez") (collectively, "Plaintiffs"), through counsel, allege as follows against the following Defendants, which worked in concert to sell one hundred and five (105) dangerous, defective, and inadequate Volvo VNL 64T 630 and Mack CXU613E trucks (the "Trucks")[1] to TPB pursuant to personal guarantees of Mr. Tamez, CEO and Owner of TPB:

    (a)     Defendants Volvo Group North America, LLC ("Volvo NA") and Mack Trucks, Inc. ("Mack"), the manufacturers of the Volvo and Mack Trucks (collectively, "Manufacturers");

    (b)     Defendants (1) Volvo Group Mexico, S.A. de C.V. Inc., also known as Volvo Group Mexico, S.A. de C.V. ("Volvo Mexico"), successor to Volvo Industrial de Mexico, S.A. de C.V. ("Volvo Industrial") and Volvo Distribuidora de Mexico, S.A. de C.V. ("Volvo

---

[1] *See* Preliminary Report of Craig J. Hoff, Ph.D., P.E., attached hereto as Exhibit 1.

Distribution"); and (2) VFS Mexico, S.A. de C.V., SOFOM, E.N.R.

("Volvo Finance") (collectively, the "Selling Defendants").

## INTRODUCTORY STATEMENT

2. Plaintiffs' claims against Volvo NA and Mack, the Manufacturers, and the Selling Defendants (collectively, the "Defendants") arise, *inter alia*, under the United Nations Convention on Contracts for the International Sale of Goods, [2] including the related Convention on the Limitation Period in the International Sale of Goods (collectively, "CISG"), and under multiple continuing tort claims under Mexican law applicable to this case pursuant to the North Carolina legal principle of *lex loci delicti* ("the law of the place of the wrong"), as well as under North Carolina law.

3. Mexico is where the "wrong" occurred because that is where Plaintiffs TPB and Mr. Tamez suffered severe financial, personal, and emotional injuries[3] caused by Defendants' collective, multifaceted, wrongful, and illegal inducement of TPB to purchase one hundred and five (105) Trucks, and Mr. Tamez to personally guarantee the obligations of TPB, *inter alia*, for the purchase of the Trucks, all of which were

---

[2] S. Treaty Doc. No. 9, 98th Cong., 1st Sess. 22 (1983), 19 I.L.M. 671, reprinted at 15 U.S.C. App. 52 (1997), also available at https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/19-09951_e_ebook.pdf.

[3] North Carolina has long adhered to the rule known as *lex loci delicti* ("the law of the situs of the claim") to determine what law applies to tort claims. *Mosqueda v. Mosqueda*, 218 N.C. App. 142, 148, 721 S.E.2d 755, 759 (2012); *see also GBYE v. GBYE*, 130 N.C. App. 585, 586 (N.C. Ct. App. 1998) ("For actions arising in tort, it is well-settled that the state where the injury occurred is considered the situs of the claim.") (citation omitted).

manufactured in the United States by Volvo NA and Mack, and sold by the Selling Defendants to Plaintiffs for use in Mexico.

4.     Defendants' active, intentional, and continuing concealment of the fact that the Trucks have never been and never will be suitable for use in Mexico with double-articulated trailers (full) with Gross Combination Weight (GCW) of 75.5 tons, no matter how many times they are repaired by Defendants, tolled the statutes of limitation on all claims asserted by Plaintiffs in this Complaint.

5.     Defendants were fully aware of such concealed risks of death and personal injury that existed from the time the Trucks were first manufactured and sold to Plaintiffs for use in Mexico, for its operations with double-articulated trailers (full), and that continued each and every time Defendants and their agents repaired the Trucks and returned them to Plaintiffs for use in Mexico.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction for this civil action brought pursuant to the CISG, a treaty of the United States.

7.     This Court also has supplemental jurisdiction over "all other claims" forming part of the same case or controversy derived from a common nucleus of operative fact, as well as any additional parties to those claims.  28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over the Defendants who are headquartered in the State of North Carolina, maintain offices in the State of North

4

Carolina within the Middle District of North Carolina, are authorized to do business in the State of North Carolina, and/or regularly and continuously conduct business in the State of North Carolina.

9.     Pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district because two of the Defendants are headquartered or reside in the Middle District of North Carolina.

## **PARTIES**

10.    Plaintiff TPB is a Mexican *Sociedad Anónima Promotora de Inversión* (SAPI) having its headquarters just outside Monterrey, Mexico—the international industrial and manufacturing epicenter of Mexico—at Av. Maestro Israel Cavazos Garza 160, Nte. Col. Jardines de la Silla, Guadeloupe, Mexico 67190.  Until TPB, pursuant to a personal guarantee of Mr. Tamez, purchased the defective Trucks from Defendants, TPB was a successful and reliable trucking company based in Monterrey, Mexico, serving significant Blue Chip international and domestic clients throughout Mexico, including to and from the United States.  Defendants' actions, including continued, repeat repairs of the inherently defective Trucks still being operated by TPB, continue on a daily basis to damage Plaintiffs.

11.    Plaintiff Mr. Tamez, a citizen and resident of Mexico, is the Chief Executive Office and Owner of Plaintiff TPB, having his business address at Av. Maestro Israel Cavazos Garza 160, Nte. Col. Jardines de la Silla, Guadeloupe, Mexico

Case 1:23-cv-00176-LCB-JEP   Document 1   Filed 02/24/23   Page 5 of 44

67190.  Mr. Tamez, to whom Defendants owed a "special duty,"[4] was induced by Defendants to guarantee TPB's obligations to the Selling Defendants, and has suffered severe financial, personal, and emotional distress injuries separate and apart from the injuries his company TPB suffered.

12.    Defendant Volvo NA manufactured the Volvo Trucks, and is a Delaware limited liability company having its headquarters in Greensboro, North Carolina.  Its sole member is Mack Trucks, Inc., a Pennsylvania corporation, wholly owned by VNA Holding, Inc., a Delaware corporation, which in turn is a wholly owned subsidiary of Swedish parent corporation Aktiebolaget Volvo ("AB Volvo").  AB Volvo shares are listed on Nasdaq OMX Nordic Exchange and are traded OTC in the United States.  The headquarters of Volvo NA is in Greensboro, North Carolina.

13.    Defendant Mack, which manufactured the Mack Trucks purchased by Plaintiffs, operates the powertrain manufacturing facility located in Hagerstown, Maryland where the powertrains for both the Volvo and Mack Trucks purchased by

---

[4] *See, e.g., Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 40, 626 S.E.2d. 315, 321 (2006) ("[T]ort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.") (internal citation omitted).  While a shareholder generally cannot recover individually for an injury to the corporation that results in loss of stock value, *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997), an exception to this rule occurs "if the [shareholder or] guarantor can show . . . that the wrongdoer owed him a special duty."  *Id.*  "[N]egligent misrepresentation by a third party which induced plaintiffs to become shareholders create[s] such a special duty."  *Allen v. Ferrera*, 141 N.C. App. 284, 291, 540 S.E.2d 761, 766 (2000).  "Applying the same rule, our Supreme Court held . . . that negligent misrepresentation by a third party that induce[s] plaintiff[] to personally guarantee a corporation's loans likewise create[s] such a special duty."  *Id.* (*citing Barger*, 346 N.C. at 658, 488 S.E.2d at 219).

Plaintiffs were manufactured. Mack is a corporation organized under the laws of the Commonwealth of Pennsylvania with its headquarters in Greensboro, North Carolina. Mack is wholly owned by VNA Holding, Inc., a Delaware corporation, which in turn is a wholly owned subsidiary of Swedish parent corporation Aktiebolaget Volvo ("AB Volvo"). AB Volvo shares are listed on Nasdaq OMX Nordic Exchange and are traded OTC in the United States.

14. Defendant Volvo Mexico, successor to Volvo Industrial and Volvo Distribution, and Volvo Finance (collectively "Selling Defendants"), each of which is a Mexican *Sociedad Anonima de Capital Variable*, worked in concert with Volvo NA and Mack to sell the defective Trucks manufactured in the United States to Plaintiffs for use in Mexico. Volvo Mexico is 100% owned by parent Swedish corporation AB Volvo, and maintains its United States headquarters in Raleigh, North Carolina. At all relevant times, until Volvo NA ceased selling heavy trucks in Mexico in 2020, the Selling Defendants primary business was selling trucks manufactured by Volvo NA and Mack in Mexico. The Selling Defendants continue to sell Mack trucks in Mexico. Thus, the Selling defendants constantly and continuously have done business in North Carolina with Volvo NA and/or Mack, both of which are headquartered in Greensboro, North Carolina.

15. Defendant VFS Mexico, S.A. de C.V., SOFOM, E.N.R. ("Volvo Finance"), which financed TPB's purchase of the Trucks pursuant to personal guarantees of Mr. Tamez, is headquartered at Avenida Santa Fe No. 495, Mz B Lt B1,

Piso 4, Col. Cruz Manca, C.P. 05349, Alcaldía Cuajimalpa de Morelos, Mexico City, Mexico, and operates in the United States at Volvo Financial Services Headquarters located at 7025 Albert Pick Road, Suite 102, Greensboro, North Carolina 27409. Volvo Finance constantly and continuously has done business in North Carolina with the other Defendants, including Volvo NA and Mack, both of which are headquartered in Greensboro, North Carolina.

## DETAILED FACTS

16.    Plaintiff TPB has operated for fifty (50) years in the national Mexican market as a federal cargo carrier, specialized in moving containers between seaports and clients in the center of the country, crossing mountains.

17.    For more than thirty (30) years, consistent with the trucking laws of Mexico, TPB has operated heavy duty trucks configured to haul double-articulated trailers (two trailers in tandem) within a total Gross Combination Weight ("GCW") of 75.5 metric tons (166,449 lbs).

18.    Defendants started a "15-15" program intended to achieve 15% market penetration in Mexico by 2015.  This program began under the leadership of Matthew Walsh, the Managing Director of Volvo Mexico from 2012 to 2015 who later took over as Vice President of Volvo Group Trucks Sales and Marketing Americas Mexico Region.

19.    Mr. Walsh, Managing Director of Volvo Mexico, reported directly to Goran Nyberg, President of Volvo Trucks North America.  Indeed, all of the Volvo

Mexico personnel identified in this Complaint reported directly to, and were directed by Volvo NA and/or Mack officials in North Carolina.

20.    To jumpstart the 15-15 program, Defendants sent a team of senior managers to meet with TPB and present an initial proposal to test a vehicle unit.  TPB is a leader in Mexico's transportation industry, and thus gaining their business would propel Volvo's "15-15" program.  The purpose of the proposal was to convince TPB to buy the vehicle given Defendants' representations that its safety, engineering, performance, and capabilities for full (double-articulated trailers) offered great advantages in Mexico.

21.    The initial meeting at TPB included Volvo employees Óscar de Vega (Commercial Director), José (Pepe) Díaz (Commercial Manager North Region), Ramón Cazares (Dealer Sales Manager 2012-2015; Regional Commercial Manager of North Zone 2015-2020), and Carlos Carrera (General Manager and Sales Director for Volvo Northeast Mexico 2012-2016).  On behalf of TPB, Gerardo Angel Tamez and Raúl Tamez were present.

22.    After the first meeting, Volvo sent its truck dealer (at the time Vehículos Nórdicos owned by Volvo Group), which included Santiago Rangel and Mauricio Mañez, to further discuss the trucks with TPB.

23.    Two weeks after the first meeting in late 2012, Volvo sent a team of employees to meet with TPB at TPB's facility.  The Volvo team included Óscar de Vega, José (Pepe) Díaz, Ramón Cazares, and Carlos Carrera.  During this meeting, the

9

Volvo team strategically offered TPB an extended warranty of 5 years or 805,000 km. Other negotiation topics were discussed, and Óscar de Vega was left to request authorization.

24.     Finally, a third meeting took place in 2012 where a Volvo team, consisting of Óscar de Vega, José (Pepe) Díaz, Ramón Cazares, Carlos Carrera, Enrique Rodríguez (Volvo Financial Services North Region Manager), and Matthew Walsh, visited TPB's facility and discussed the purchase of the Trucks with Gerardo and Raúl Tamez.

25.     At the third meeting, the Volvo team presented Gerardo and Raúl Tamez with purchase opportunities, used unit trade-in options, and a proposed 5-year extended warranty, or 805,000 km.  Matthew Walsh boasted this guarantee since according to him and Óscar de Vega, Volvo was confident of its strengths and quality for use in Mexico of the full (double-articulated trailer) trucks.

26.     On February 20, 2013, José (Pepe) Díaz (Commercial Manager North Region), presented Plaintiffs with a formal proposal with warranties extended to five (5) years or 500,000 miles and a four (4)-year guaranteed buyback program at US$48,000 per unit.

27.     The cover photo of the formal proposal, Exhibit 2, included a photo of the VNL64T630 unit with a double-articulated trailer.

28.     On March 9, 2013, Volvo presented Plaintiffs, at TPB's yard, with a 2014 model VNL630 truck with a Volvo D13 engine, 18 speed Eaton Fuller transmission,

46,000lb Meritor Differentials and a differential ratio of 4.56:1 (the exact unit previously described in the February 20th proposal). Volvo's senior management, including Óscar de Vega, José (Pepe) Díaz, Matthew Walsh, and Ramón Cazares were present during the visit to TPB's yard. The unit was registered and insured by TPB.

29.    On March 18, 2013, driving tests were carried out. The Volvo personnel present when the testing commenced included Ramón Cazares, Carlos Carrera, Juan José Hernández (Service Manager North Region), Óscar de Vega, José (Pepe) Díaz, and Isaac Galicia Morena (Field Engineer). TPB personnel included Roberto Olivares (TPB maintenance manager), Gerardo Tamez, and Raúl Tamez. Óscar de Vega assured TPB that this truck was the best option for TPB's operation in Mexico with full (double-articulated trailers).

30.    At the end of March 2013, the results of the field test carried out with the Volvo VNL-630 unit were presented to Plaintiffs. Defendant's employees Matthew Walsh, along with Óscar de Vega, José (Pepe) Díaz, Ramón Cazares, and Carlos Carrera, were present. Matthew Walsh expressly stated that the truck offered the best engine for Plaintiffs' purposes, had greater hauling capacities, and could haul at the lowest cost of fuel per kilometer.

31.    At the same presentation, José (Pepe) Díaz expressly stated that all nationwide tests for the double-articulated trailer were going well.

32.    A few days later, José (Pepe) Díaz returned to TPB to present the formal purchase order for the 2014 trucks. Plaintiffs agreed to purchase the trucks and

11

committed to acquire eighty (80) units within three years. The order was signed at TPB's office with Volvo employees Óscar de Vega and Carlos Carrera.

33.     At the time of the formal signing, Óscar de Vega insisted that the best configuration for the truck was the iShift, but the first order was placed with Eaton Fuller because the iShift transmission was not made available to TPB.

34.     In April 2013, 20 days after Plaintiffs placed the first order of the 2014 trucks, Volvo delivered a unit with iShift to TPB. The Volvo team, led by Matthew Walsh, Óscar de Vega, José (Pepe) Díaz, Ramón Cazares and Carlos Carrera, traveled to TPB to present the vehicle.

35.     At the TPB facility, Matthew Walsh indicated that the iShift has the ideal configuration for the operation of the full (double-articulated trailers) because the iShift transmission was designed with the same electronic platform as the engine. Thus, according to Mathew Walsh, the iShift's compatibility with the engine offers better shifting capabilities and is thus ideal for the full (double-articulated units).

36.     Additionally, at the same meeting, Óscar de Vega stated that the iShift was the best transmission for TPB's operation and that the transmission is the sister to the engine and can communicate precisely to shift gears. Óscar de Vega stated that the efficient gear changes of the iShift would result in fuel savings, and that the torque was better than the 18-speed Eaton Fuller.

Case 1:23-cv-00176-LCB-JEP   Document 1   Filed 02/24/23   Page 12 of 44

37.     Overall, the positive arguments about the iShift unit were backed by the entire Volvo team.  The Volvo team intended to induce Plaintiffs to purchase the trucks with the Volvo powertrain iShift transmission and Volvo engine.

38.     Subsequently, driving tests were carried out with the iShift unit.  TPB had the unit for 6 months.

39.     For future orders, recall that TPB had a commitment to acquire eighty (80) units within 3 years, TPB purchased the trucks with the iShift transmissions at the insistence of Matthew Walsh, Óscar de Vega, José (Pepe) Díaz, and Carlos Carrera.

40.     The first Volvo units were delivered on July 20, 2013.  Subsequently, in the second to fourth quarters of 2014, the 2015 model year units were received, and the 2016 model year units were received in the first to third quarters of 2015.

41.     In the first quarter of 2014, Volvo employees Matthew Walsh, Scott Parten (Vice President of Sales and Marketing USA South Region), Óscar de Vega, José (Pepe) Díaz, Ramón Cazares, Carlos Carrera, and Enrique Rodríguez visited TBP and met with Gerardo and Raúl Tamez.  The group met and discussed the purchase of the units with iShift, growth plans, unit delivery issues, and invoices.

42.     At the abovementioned meeting, there was a discrepancy in the price of the Volvo iShift transmission.  Matthew Walsh and Óscar de Vega insisted that the iShift was best for the full (double-articulated trailers).  Matthew Walsh then left the boardroom to call his boss Goran Nyberg.  When Mr. Walsh returned to the meeting,

Case 1:23-cv-00176-LCB-JEP   Document 1   Filed 02/24/23   Page 13 of 44

he offered to keep the price the same as the manual transmissions, and the purchase order was signed by TBP on the spot.

43.     The "Customer Proposal" prepared by Volvo Distribution for Volvo Mexico (Exhibit 2 hereto), which presented the Proposal to Plaintiffs on March 11, 2013, represented that Volvo VNL 630 trucks, manufactured by Volvo NA for the "Mexico Standard Market," were manufactured and configured to haul "Double Van Trailers."

44.     Likewise, to induce Plaintiffs to purchase additional Trucks, Defendants' senior management, including Marco Ortega (Volvo Tucks Mexico CEO 2015-2017) and Martin Saenz (Volvo Trucks Mexico CEO 2017-2019), visited TPB´s facilities on several occasions, invited Mr. Tamez to visit the plant in Dublin, VA, invited Mr. Tamez to visit the powertrain factory in Hagerstown, MD, arranged a meeting with Goran Nyberg (President Volvo Trucks North America 2012-2018), and invited Mr. Tamez to discuss the issues with Peter Voorhoeve (President of Volvo Trucks North America 2018–present).   At all times, Defendants promised to resolve the issues without success.

45.     On October 25, 2019, Volvo Mexico's Chief Executive Officer Luz Elena Jurado and Paul Camacho, Volvo Mexico's Aftermarket and Service Director, visited TPB.   Paul Camacho stated that the trucks were failing because they were not configured or capable of hauling fully loaded, double-articulated trailers, as permitted in Mexico.

14

46.     That fact had long been known—and concealed—by Defendants from TPB.

47.     The Trucks are significantly underpowered for the TPB application in Mexico encompassing 75.5 tons GCW double-articulated trailers. *See* Exhibit 1.

48.     The Trucks sold by Defendants needed to operate at near maximum power, often at low operating speeds.  These operating conditions were known by Defendants to cause premature wear and contribute to the high rate of truck failures (blown engines, blown transmissions, blown cooling systems).

49.     Defendants knew or should have known, and concealed from Plaintiffs, the fact that when the Trucks were fully loaded to 75.5 tons GCW, the Trucks could not maintain adequate speed  on even modest grades, let alone steep highway grades common in Mexico, creating a serious risk of injury and death, as the Trucks may have to come to a complete stop and be disassembled so each double-articulated trailer can be hauled one by one.

50.     At the time the Trucks were manufactured and sold by Defendants to Plaintiffs, Defendants manufactured and sold a line of trucks with 16 liter engines 750HP, and ATO3512D (3500 newton meters), in numerous other countries, but not in Mexico, that are intended for heavy haul applications.

51.     Defendants' decision not to sell the appropriately powered and configured trucks in Mexico was based upon economic factors and a disregard of severe safety hazards caused by operating the underpowered Trucks sold by Defendants to Plaintiffs.

52. In full and reasonable reliance upon the recommendation and representations of Defendants, including the special extended warranty and buyback program, Plaintiffs purchased eighty-three (83) Volvo VNL 630 heavy trucks (the "Trucks") with model years 2014, 2015, and 2016, and twenty-two (22) Mack CXU613E year model 2017 heavy trucks (collectively the "Trucks"), all of which were manufactured in the United States by Volvo NA and Mack, and sold to Plaintiffs for use in Mexico.

53. Such sales of the Trucks to Plaintiffs by Defendants were one of the largest purchases of Volvo trucks at the time for use in the Mexican market. As a result, Volvo used TPB as an opinion leader to promote the Volvo Trucks brand, especially in the northern Mexico.

54. Because of Defendants' failure to disclose the fact that the Trucks were not suitable for their intended use in Mexico and their express representations to the contrary, Plaintiffs were unaware before, during, and after the purchase of the Trucks that the Trucks were not mechanically capable of being operated by TPB in their intended, legally permitted manner in Mexico.

55. Prior to recommending to Plaintiffs that they purchase Volvo VNL 630 heavy trucks, Defendants were fully aware of Plaintiffs' intended use of the Trucks in Mexico where heavy trucks, such as those purchased by Plaintiffs from Defendants, would be used to pull double-articulated trailers with a total GCW of 75.5 tons—approximately twice the GCW legally permitted in the United States. *See* Exhibit 1.

56.     Defendants were fully aware that the Trucks sold to Plaintiffs were not mechanically capable of being operated by Plaintiff TPB in Mexico without multiple powertrain and heat-related failures.

57.     Indeed, in connection with selling the Trucks to Plaintiffs, Defendants ignored the warnings in the internal Volvo Trucks safeguard system, which returned a warning to the Volvo sales engineer that the Trucks could not be configured for the uses intended by TPB in Mexico—uses of which Defendants were fully aware before, during and after the sale of the Trucks to Plaintiffs.

58.     The Trucks were purchased by Plaintiffs for use hauling double-articulated (full) trailers in Mexico, with a GCW of 75.5 tons, as permitted by Norma Official Mexicana NOM-012-SCT-2-2014 (*Sobre el peso y dimensiones máximas con los que pueden circular los vehículos de autotransporte que transitan en las vías generales de comunicación de jurisdicción federal*) (National Standard on the maximum weight and dimensions with which the vehicles of motor transport may circulate in the general roads of federal jurisdiction) (hereinafter, "NOM-012").

59.     The configuration of the eighteen (18) 2014 model Trucks sold by Defendants to Plaintiffs included the Volvo D13 500HP Engine, Eaton Fuller 18 speeds manual transmission, and 46,000 pound-rated Meritor differentials with 4.78:1 differential ratios.  The 2014 trucks each had a GCW of fifty-seven (57) tons.

60.     The thirty-seven (37) 2015 and twenty-eight (28) 2016 model Trucks purchased by Plaintiffs had the same configuration, but with the Volvo iShift

ATO2612D transmissions and differential ratios of 4.30:1. The 2015 and 2016 Trucks had a GCW of thirty-six tons, except for one-unit that was GCW (50) tons.

61. The twenty-two (22) 2017 Mack trucks purchased by Plaintiffs had a configuration of MP8 465HP Mack engine (same as Volvo D13), mDrive Mack ATO2612D transmission (same as Volvo iShift), and 44,000 pound-rated Mack differentials with 3.79:1 differential ratios. The 2017 Mack trucks each had a GCW of thirty-six (36) tons.

62. All members of the Volvo sales team had performance bonuses and were given great incentives to sell the Trucks with proprietary powertrain (Volvo engine and transmission) to Plaintiffs despite the Trucks' known inability to perform in Mexico as TPB intended with double-articulated trailers.

63. In order to register and obtain federal plates, the Defendants issued a letter for each unit, addressed to the Secretaria de Comunicaciones y Transportes (SCT) (Mexican Department of Transportation), detailing the unit specifications. Based on that letter and the Department's finding that the Trucks complied with the requirements, the SCT (DOT) issued a permit for each unit to operate with double-articulated trailers. As stated above, Defendants deliberately misrepresented the specifications of some units to obtain the required permits and attain plates to operate on the Mexican federal highways.

64. Each performance certificate issue by the SCT (DOT) stated that, "The vehicle may circulate on roads and bridges under federal jurisdiction, provided that it

complies at all times with regard to the maximum gross vehicle weight and maximum dimensions, established in the Official Mexican Standard NOM-012-SCT-2-2017…," which meant that double-articulated trailers and a GCW of 75.5 tons.

65.     In addition, as Dr. Hoff states in his preliminary report, Exhibit 1 hereto,

> The analysis conducted here indicates that the Volvo- and Mack-branded trucks sold to TPB are significantly underpowered for the TPB application. The models indicate that the trucks will need to operate at near maximum power, often at low operating speeds. These operating conditions are very hard on a powertrain and they are most likely contributing to the high rate of truck failures (blown engines, blown transmissions, blown cooling systems, etc.). The study also suggests that the Volvo trucks would be a safety hazard when used in the TPB application, as the models show that the trucks can only creep up long uphill grades typical in Mexico at very low speed (<15 mph). Their inability to keep up with other traffic would not be safe.

*See* Exhibit 1.

66.     In multiple trucking industry news media outlets, Matthew Walsh, Managing Director of Volvo Mexico from 2012 to 2015, expressly represented that the VNL truck complied with NOM-12 and was specially designed to comply with full light and heavy load applications.  He also proclaimed that the Volvo VNL 630 is the ideal option for the application of the tractor with two trailers.

67.     Additionally, Volvo conveyed a focus on high quality trucks, safety, and customer service.  Matthew Walsh stated that Volvo was poised to bring market solutions that will work extremely well for its customers moving between Mexico and the United States and that his leadership would focus on the programs and services

Volvo offers with its high-quality vehicles to offer customized solutions based on Volvo Mexico's segment of customers. Volvo has also represented that safety and security is non-negotiable for Volvo Trucks, and that Volvo's objective is zero road accidents. The iShift transmission was proclaimed to reduce the chances of being involved in an accident by 22%.

68.     Multiple issues of *Volvo Trucks Magazine* showed Volvo trucks with iShift transmissions driving through mountainous terrains and represented that the D13 engine was the perfect choice for long distance travel and regional operations.

69.     The Trucks sold by Defendants to Plaintiffs all had multiple mechanical failures and premature wear caused by being operated entirely within the legally allowable limit provided by Mexican law of which Defendants were fully aware when they sold the Trucks to Plaintiffs. In fact, a Volvo Field Engineer was assigned to perform the field tests on the actual routes used by TPB before the purchase and during the driver´s training.

70.     TPB repeatedly made good faith efforts to solve the Trucks' problems and communicate with the following Volvo personnel: the four CEO´s, Matthew Walsh, Marco Ortega, Martin Saenz, and Luz Elena Jurado; the Service Personnel lead by Ariel Delgado and later by Paul Camacho; and their field team Juan Jose Hernandez and Enrique Gonzalez (both succeeding each other as Service Manager for the North Region). Rather than solving the problems with the Trucks,  a Volvo technical team lead by Porfirio Sandoval withheld from TPB the fact that none of the Trucks were

configured to haul permitted loads under NOM-012, which authorizes GCW of 75.5 tons.

71. Because Defendants were fully aware that the Trucks were failing since they were not capable of being used in Mexico for the purposes for which they were sold to Plaintiffs, Defendants repeatedly repaired the Trucks as they broke down and failed—and never once asserted that TPB was using the Trucks in a manner, or with a load, that exceeded the capacity of the Trucks.

72. Paul Camacho, Volvo Mexico's Aftermarket and Service Director, represented to Plaintiffs that Volvo Mexico had identified the problems with the Trucks' transmissions and that making changes to some components, such as incorporating "kits," would stop the failures from occurring. However, Plaintiffs had to pay for the "kits," with the uncertainty if the transmissions would stop failing with those kits. Defendants at all times knew that the Trucks were never capable of operating with 75.5 tons GCW—and there were no "fixes" that could change that.

73. While the failures and most of the repairs were covered under the warranty, the response times of Defendants were slow, the availability of spare parts and repair times were low, and thousands of days in the Volvo and Mack repair shops in Mexico caused Plaintiffs to suffer tens of millions of (US) dollars in damages.

74. Because Defendants were fully aware that the Trucks were failing since they were not capable of being used in Mexico for the purposes for which they were sold to Plaintiffs, Volvo failed to carry out an analysis that would result in a campaign.

Volvo's lack of initiative to fix the problem caused the equipment to keep failing and Plaintiffs to reapply the warranty, worried if Volvo would fix the problem when the coverage ends.

75.    Downtime and breakdowns of the Trucks on the roads of Mexico caused Plaintiffs TPB enormous economic damage, loss of customers due to persistent unreliability of the Trucks, serious endangerment of TPB's employees and innocent travelers on the roads where TPB was operating the Trucks, and disastrous loss of good will and the economic ability to finance operations.

76.    Because of the debilitating damages suffered (and still being suffered) by Plaintiffs, they sought to enforce an agreement made with Defendants when the Trucks were purchased under which Defendants agreed to buy back the Trucks at set prices. Despite the buyback agreement, Defendants through Marco Ortega, Martin Saenz, and Mrs. Luz Elena Jurado, refused to honor the agreement, causing Plaintiffs to continue to suffer enormous losses caused by the inability of the Trucks to successfully operate in Mexico.

77.    Both before and after the sale of the Trucks to TPB, Defendants internally investigated failures of Volvo and Mack heavy trucks operating in Mexico. In those internal investigations, it was concluded that 95.99% of the trucks had recurrent engine problems after just thirty-six (36) months of use. The internal investigation also determined that the operation of the heavy trucks became extremely dangerous due to transmission failures, with the harness cutting communications with the ECUs and

possible giving false information so the engine and transmission will increase or decrease torque for ascending or descending roads, adversely operating to the unit and event needs.

78.     Such recurrent powertrain failures were determined in the internal investigation to be dangerous because the trucks were not capable of safely hauling more than one trailer at a time up an inclined road.

79.     Defendants have carried out road tests in Mexico to determine fuel economy of their heavy trucks but in reporting those road test results to Mexican trucking companies, concealed the fact that the fuel economy test results did not consider the startability, gradeability, and load factors of the trucks tested.   For example, Volvo conducted a test on March 12, 2013, of a Volvo VNL 64T 630 with an Eaton Fuller, RTLO-18918B transmission and a Volvo D13F motor, which found that fuel savings were increased by 32% but did not include the gradeability or load factor of the truck tested.

80.     Likewise, Volvo engineers recommended greatly limiting the speed of its heavy trucks operating in Mexico, and not using the trucks on inclines of more than 1.3 degrees (a typical U.S. federal highway has a maximum grade of 6 degrees), which would cause premature and dangerous wear and tear to the trucks' powertrains.

81.     Additionally, in 2018, Volvo conducted an exhaust valve failure analysis for the Mexican market, which revealed that a new valve material in Mexico was experiencing failures at high altitudes.  Specifically, the data revealed that in vehicles

23

built from July 2015 to February 2018, there was a 94.36% fail rate at 500,000 km. Volvo introduced a new material and released an improvement campaign for high altitude customers for the 2013 and 2015 emissions years. It recommended a pro-active campaign for customers such as TPB, who was listed as a potential customer for targeted action since it had sixteen (16) affected trucks.

82. Defendants procedure to build a truck with iShift transmission included an authorization form sent to Product Marketing Manager for the iShift Transmission. Allison Athey, Product Marketing Manager for the iShift Transmission, authorized the manufacture of the 2015 to 2018 models through a request form sent by Gilberto Rodriguez, Mexico Volvo and Mack Sales Engineer.

83. Despite Defendants' representations to Plaintiffs to the contrary, the Trucks, as configured by Defendants, were not suitable for use in Mexico with double-articulated trailers and the GCW of 75.5 tons permitted by Mexican law NOM-012.

84. Defendants had full knowledge—intentionally concealed by Defendants from Plaintiffs—that the Trucks sold to Plaintiffs for use in Mexico were not suitable for that use and, importantly, created a substantial and unreasonable risk of death or personal injury, something Plaintiff TPB experienced twice.

85. First, a Mack Truck manufactured and sold by Defendants to TPB, which was configured almost identically to the Volvo Trucks, caused the death of an innocent person on a Mexican highway when the driver had to disassemble the double-

articulated vehicle, climb with one trailer, and return for the second, and found a vehicle crashed into the parked trailer.

86. Second, when one of its Volvo Trucks was descending a slope, the Trucks could not be stopped, killing the TPB driver.

87. Despite such knowledge that the Trucks sold to Plaintiffs for use in Mexico were not suitable for that use and, importantly, created a substantial and unreasonable risk of death or personal injury, Defendants dismissed warnings of its sales and service engineers and personnel and continued to sell its incapable trucks until abandoning the Mexican market and its customers, including Plaintiff TPB, in December, 2020.

88. On February 20, 2013, Defendant Volvo Distribution, now merged into Volvo Mexico, prepared a formal thirty-seven (37) page Customer Proposal (Exhibit 2 hereto) for Volvo Mexico, which was then transmitted to Plaintiffs with the purpose of inducing TPB to purchase, and Mr. Tamez to personally guarantee the purchase of the eighty (80) Trucks manufactured by Volvo NA from the Selling Defendants for use in Mexico.

89. Mr. Tamez also personally guaranteed the purchase of the twenty-two (22) Mack Trucks manufactured by Mack in the United States and sold to TPB for use in Mexico pulling double-articulated trailers with a total GCW of 75.5 tons.

90. The twenty-two (22) Mack units were sold by Emerson Gutierrez, Mack Mexico Director, a direct report to Eduardo Herrera, Mack Exports based in the US,

25

accompanied by Luis Guillermo de Leon and Virgilio De Los Santos from the dealer in Monterrey, with the same conditions including, grace period to principal and interest, as well 5-year extended warranty or 805,000 kilometers.

91.     The Volvo Customer Proposal—prominently featuring double-articulated trailers on its cover—falsely, fraudulently, and intentionally misrepresented to Plaintiffs that the Trucks were suitable for use in Mexico pulling double-articulated trailers with a total of 75.5 tons GCW.  *See* Exhibit 2.

92.     In sum, Defendants before, during, and after the purchase of the Trucks never disclosed the material fact that the Trucks were not capable and suitable for use in Mexico by Plaintiff TPB, and instead misrepresented that the Trucks were capable and suitable for use in Mexico by Plaintiff TPB.

93.     As manufacturers, potential sellers, and sellers of the Trucks and contracting parties, Defendants had a duty to disclose to Plaintiffs the true capability and suitability of the Trucks for use in Mexico.

94.     Contrary to Defendants' representations, the Trucks, including their engines, transmissions, and other parts, sold to Plaintiffs in Mexico for use in Mexico, suffered extraordinary failures because they, in fact, were neither designed, manufactured, nor configured with the actual ability to operate in Mexico with double-articulated trailers weighing a total of 75.5 tons (including the truck) at high altitudes on mountainous, and in exceptionally warm weather.

95.    To date, the engines, transmissions, or other significant parts on all hundred and five (105) Trucks have failed, often numerous times, and far more often than is typical for other brands of heavy trucks operating in Mexico, and far more than Volvo and Mack trucks typically fail in the United States.

96.    The following chart, based upon the attached preliminary analysis of Truck repair data, Exhibit 1, represents a sample of the failures of the Trucks and the repairs made by Volvo Group Mexico and its affiliates to the Trucks:



97.    Defendants have never refused to make a repair covered by the warranty on the basis of any misuse or abuse of any of the Trucks by Plaintiff TPB, which always and only used the Trucks to haul legally permitted types and weights of cargo in and around Mexico, and to and from the United States.

98.    Each time a Truck was repaired and returned to Plaintiff TPB for continued use in Mexico, regardless of whether such repairs were covered by any

warranty, Defendants thereby represented to Plaintiffs that the Trucks were suitable for continued use in Mexico. For example, Paul Camacho, Volvo Mexico's Aftermarket and Service Director, told Defendants it was necessary to incorporate certain "kits" into the routine for the transmission because the transmissions were known to fail when used in Mexico.

99. Both before and after being repaired by Defendants, the Trucks repeatedly failed, and were repeatedly repaired by Defendants, often but not always under the warranty, only to fail again and again, each time costing Plaintiffs significant money and loss of reputation.

100. The Trucks including, without limitation, their engines, transmissions, and other parts, continued then, and to this day continue, to fail because they were neither designed for nor capable of operating in Mexico where trucks are permitted to haul up to 75.5 tons of cargo and the Mexican terrain, road grade, and conditions are known to be exceptionally difficult.

101. In December 2020, Volvo NA announced that it was "discontinuing" the sale of heavy trucks, which includes the type of truck sold to Plaintiffs. Volvo NA falsely blamed the decision to stop selling solely upon the COVID-19 pandemic without mentioning that its decision was also based upon the fact, experienced by TPB and other trucking companies in Mexico operating Volvo heavy trucks, that Volvo trucks such as those purchased by Plaintiffs were incapable of operating in Mexico.

28

102. Defendants' decision to leave the Mexican market was not, in fact, the result of the COVID-19 pandemic as Defendants falsely represented to Plaintiffs, the media, and others, but was rather because the powertrains, including the Volvo engines and iShift transmissions in the Trucks purchased by Plaintiffs, as well as by multiple other Mexican trucking companies, were not suitable for use with double-articulated trailers with a GCW of 75.5 tons—a fact long-known and, to this day, never admitted or disclosed by Defendants to Plaintiffs.

103. Defendants' decision to leave the Mexican market also caused a precipitous drop in the values and available sales prices of used Volvo trucks, such as the Trucks Plaintiffs purchased in good faith from Defendants, further damaging Plaintiffs.

## CAUSES OF ACTION

## COUNT ONE

## FUNDAMENTAL BREACH UNDER CISG ARTICLE 25[5]

104. Plaintiffs incorporate the allegations as set forth in Paragraphs 1-103 of this Complaint as if fully set forth herein.

---

[5] CISG Article 25 states a fundamental breach of contract as, "A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result."

105.   Under CISG Article 45(1)(b), Defendants are liable to Plaintiff TPB for losses caused by Defendants' delivery of the non-conforming Trucks pursuant to purchase contracts personally guaranteed by Mr. Tamez.

106.   Defendants' inadequate design, formulation, and configuration of the Trucks, which repeatedly failed and were repeatedly repaired by Volvo and Mack under warranty, and then failed over and over again because they were neither designed for, nor capable of, operating in Mexico where trucks are permitted to haul up to 75.5 tons of cargo and the Mexican terrain, road grade, and conditions are known to be exceptionally difficult, caused a fundamental breach of the contract with Plaintiff TPB.

107.    Defendants are liable to Plaintiff TPB because the Trucks could have been, and should have been, designed, formulated, and configured in a safer, more practical, feasible, and otherwise reasonable way so that the Trucks could successfully operate in Mexico with double-articulated trailers as Defendants falsely and fraudulently misrepresented they could be so operated.

108.   Defendants also are liable for the inadequate design, formulation, and configuration of the Trucks, which could have been, and should have been, designed, formulated, and configured in a safer, more practical, feasible, and otherwise reasonable way so that the Trucks could successfully operate in Mexico as Defendants misrepresented they could.

109. Defendants' breaches caused severe damage to the detriment of Plaintiff TPB, which was deprived of what it was entitled to expect under the contract with Defendants.

110. The life-endangering hazards posed by the defective design of the Trucks and the resulting damages to Plaintiff TPB were reasonably foreseeable or should have been reasonably foreseen by Defendants.

111. At the time the Trucks left Defendants' control, the configuration, design, and true capabilities of the Trucks, which were known to Defendants and concealed from Plaintiffs were so unreasonable that a reasonable person, aware of the relevant facts, would not have purchased the Trucks for use in Mexico, with GCW up to 75.5 tons.

112. Defendants' concealment caused Plaintiffs to be unaware of the configuration, design, and true capabilities of the Trucks and intentionally induced Plaintiffs to enter into the purchase contracts personally guaranteed by Mr. Tamez.

113. In breach of Defendants' obligations to Plaintiffs, which purchased the Trucks that supposedly were configured, designed, and capable of safely hauling up to 75.5 tons of cargo on and in the exceptionally difficult Mexican terrain, road grade, and conditions, Defendants failed to disclose to Plaintiffs that the configuration, design, and capabilities of the Trucks were inadequate for the Trucks' intended and lawful purpose and safe operation by Plaintiffs in Mexico.

114. Defendants were negligent and breached their duty of due care to Plaintiffs by taking or failing to take the actions as previously alleged to avoid harm to Plaintiffs in light of the reasonably foreseeable dangers caused by the inadequate design, manufacture, sale, and delivery of the Trucks to Plaintiffs in Mexico.

115. As a direct and proximate result of the actions and inactions by Defendants, Plaintiffs, through no fault of their own, have suffered severe economic injuries for which Plaintiff TPB, pursuant to CISG Article 45(1)(b), is entitled to full compensation and damages, jointly and severally, from Defendants including, without limitation, loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss, in an amount not less than US$70 Million to be proven at trial.

## COUNT TWO

## FRAUD INCLUDING FRAUDULENT INDUCEMENT, MISREPRESENTATION, DECEIT, AND CONCEALMENT

116. Plaintiffs incorporate the allegations as set forth in Paragraphs 1-115 of this Complaint as if fully set forth herein.

117. Plaintiff TPB is a commercial trucking company operating in Mexico as a federal cargo carrier, specialized in moving containers between seaports and clients in the center of the country, crossing mountains.

118. As detailed above, Plaintiff Mr. Tamez, the CEO and Owner of TPB, was induced through numerous electronic and in personal communications and meetings in

both Monterrey, Mexico, and Dublin, Virginia, by Defendants and their top executives, to personally guarantee TPB's obligations to the Selling Defendants.

119. For more than thirty (30) years, consistent with the trucking laws of Mexico, TPB has operated heavy duty trucks configured to haul double-articulated trailers (two trailers in tandem) with a total GCW of 75.5 tons.

120. Like all commercial trucking companies, Plaintiff TPB is required by law to operate its commercial trucking business in Mexico in a safe and prudent manner that does not endanger, harm, or cause the death of anyone, including not only TPB's own personnel, but also the public using the same state and federal roads and highways in Mexico used by TPB for the operation of its trucks, including the Trucks manufactured and sold by Defendants to Plaintiffs.

121. Defendants' intentional manufacture, configuration, and sale of the Trucks to Plaintiffs for use in Mexico created a substantial and unreasonable risk of death or personal injury—something that unfortunately TPB twice experienced first-hand.

122. Prior to selling the Trucks to Plaintiffs, Defendants were fully aware and willfully disregarded the fact that all of the Trucks manufactured and sold by Defendants to Plaintiffs would be hauling double-articulated trailers with a total GCW of 75.5 tons between Mexican seaports and TPB's clients in the center of Mexico, which could only be reached by traversing mountainous, steeply inclined roads and highways.

33

123.    Defendants knew and concealed the critical fact that the Trucks manufactured and sold to Plaintiffs were not capable of hauling double-articulated trailers with a total GCW of 75.5 tons between Mexican seaports and TPB's clients in the center of Mexico, which could only be reached by traversing mountainous, steeply inclined roads and highways.

124.    Defendants, through active concealment of such facts, as well as Defendants' false oral and written disclosures made electronically and in person to Plaintiffs, intentionally induced Plaintiffs into purchasing one hundred and five (105) Trucks, and guaranteeing such purchase, that were never mechanically capable of operating as required to operate in Mexico with double-articulated trailers and GCW of 75.5 tons.

125.    Likewise, as the Trucks failed because they were never capable of operating in Mexico as intended by the Plaintiff TPB, Defendants and their agents repaired the Trucks, actively misrepresenting after each repair, and concealing from Plaintiffs, the fact that the repairs made to the Trucks would not enable them to operate as required in Mexico with GCW of 75.5 tons.

126.    Defendants and their executives, as detailed above, falsely and intentionally misrepresented critical facts about the capability of the Trucks when they manufactured, sold, and subsequently repaired the Trucks thousands of times.

127.    Defendants' false and intentional misrepresentations, deceit, and concealment of the fact that the Trucks were incapable when originally manufactured

and sold to Plaintiffs, as well as when thereafter repaired and delivered back to Plaintiff TPB, wrongfully induced Plaintiffs into believing that the Trucks were capable of operating in Mexico with a GCW of 75.5 tons.

128.    Defendants' false and intentional inducements, misrepresentations, deceit, and concealment, all with wonton and willful disregard of Plaintiffs' interests—and for the purpose of making a profit through the sale of the deficient Trucks to Plaintiffs—failed to ever, including to this very day, truthfully inform Plaintiffs that the Trucks were not capable of hauling double-articulated trailers with a total GCW of 75.5 tons between Mexican seaports and TPB's clients in the center of Mexico, which could only be reached by traversing mountainous, steeply inclined roads and highways.

129.    Because of Defendants' blatant disregard of the "special duties" owed to Mr. Tamez as personal guarantor of TPB's obligations to the Selling Defendants, and the high degree of probability their false and intentional inducements, misrepresentations, deceit, and concealment would inflict severe emotion distress upon Mr. Tamez, Defendants' fraudulent conduct severely injured Mr. Tamez.

130.    Plaintiffs reasonably relied upon Defendants' inducements and representations to their severe economic detriment.

131.    Defendants owed Plaintiffs a duty to not defraud Plaintiffs by acting with recklessness, wantonness, and willful disregard of Plaintiffs' needs and interests.

132.    Defendants owed Plaintiffs a duty to not misrepresent and conceal material facts from Plaintiffs, including that the Trucks were incapable when originally

manufactured and sold to Plaintiffs, as well as when thereafter the Trucks were repaired and delivered back to Plaintiff TPB.

133. Through Defendants' disregard for Plaintiffs' rights and interests, Defendants never advised Plaintiffs that the Trucks manufactured for Plaintiffs and sold by Defendants to Plaintiffs were incapable of operating as required in Mexico with a GCW of 75.5 tons, when originally manufactured and sold to Plaintiffs, as well as when thereafter the Trucks were repaired and delivered back to Plaintiff TPB.

134. Defendants were fully aware and knew or should have known that the Trucks manufactured and sold to Plaintiffs did not possess the necessary capabilities to operate in Mexico as required by Plaintiffs.

135. Defendants knew and now know that their representations about the Trucks' ability to operate as required in Mexico to Plaintiffs from before the Trucks were manufactured and sold to Plaintiffs through today were false.

136. Plaintiffs at all times honestly and reasonably relied upon Defendants' representations when it purchased the Trucks as well as when it continued to use the Trucks after being repaired by Defendants, reasonably believing that the Trucks were capable of operating in Mexico with GCW of 75.5 tons, and, had no knowledge that Defendants' representations were false.

137. Defendants repeated and willful disregard of their duties and obligations owed to Plaintiffs—all for the express purpose of making a profit—proximately caused Plaintiffs to suffer and to continue suffering multiple injuries.

138.    Defendants are liable to Plaintiffs for all injuries proximately caused by Defendants' fraud including their fraudulent inducement, fraudulent misrepresentation, deceit, and concealment.

139.    As a result of the above, in addition to punitive damages, Plaintiffs seek from Defendants, jointly and severally, actual damages including, without limitation, damages resulting from loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss, and as to Mr. Tamez, without limitation, loss of familial relations and severe emotional distress in an amount not less than US$70 Million to be proven at trial.

## COUNT THREE

## NEGLIGENT, WILLFUL, WANTON, AND RECKLESS MISREPRESENTATION, DECEIT, AND CONCEALMENT

140.    Plaintiffs incorporate the allegations as set forth in Paragraphs 1-139 of this Complaint as if fully set forth herein.

141.    Defendants knew before manufacturing, configuring, and selling the one hundred and five (105) Trucks to Plaintiffs, and knew before each repair of each Truck, that the Trucks were not, and never would be, capable of safely operating without the risk of causing deadly harm to Plaintiffs and innocent people using the same roads and highways on which the Trucks operate in Mexico.

142.    Defendants, individually and collectively, ignored and failed to act upon their knowledge that the Trucks were not and never would be capable of safely

operating without the risk of inflicting deadly harm to Plaintiff TPB and innocent people using the same roads and highways on which the Trucks operate in Mexico.

143.    Such wrongful actions and material misrepresentations by Defendants, on which Plaintiffs reasonably relied, deprived Plaintiffs of the opportunity of free choice as to whether or not to expose themselves to the dangers of operating the Trucks.

144.    The Defendants negligently, willfully, wantonly, and/or recklessly intentionally concealed the dangers of the Trucks from Plaintiffs, thus denying Plaintiffs the knowledge that would have prevented Plaintiffs from purchasing, and guaranteeing the purchase of, the one hundred and five (105) Trucks in the first place, and subsequently operating the Trucks at great financial, personal, and potentially deadly risk.

145.    The misrepresentations, deceit, and concealment by each Defendant, violated Defendants' duty to disclose the dangerous lack of capability of the Trucks to operate in Mexico because of Defendants' position as seller of the Trucks and the "special duties" owed to Mr. Tamez.

146.    Defendants' misrepresentations, concealment and overall deceit resulted in a breach of their duty to disclose to Plaintiffs the true capabilities, or lack thereof, of the Trucks to operate in Mexico with double-articulated trailers and a GCW of 75.5 tons.

147. Defendants, as sellers of the Trucks, owed Plaintiffs "special duties," and breached these duties by misrepresenting the Trucks ability to operate in Mexico with GCW of 75.5 tons.

148. The misrepresentations, deceit, and concealment by Defendants, and each of them, were done with negligent, willful, and wanton disregard for the safety of Plaintiffs and others when Defendants, and each of them, had knowledge, or should have had knowledge, of the dangerous lack of capability of the Trucks to operate in Mexico, thereby entitling Plaintiffs to actual and, for willful and wanton disregard, punitive damages against Defendants, jointly and severally.

149. Accordingly, as a result of Defendants' conduct in which they acted in willful and wanton disregard for the health and safety of Plaintiffs and innocent third parties operating in proximity to the Trucks, Plaintiffs therefore seek exemplary and punitive damages against Defendants.

150. Defendants' blatant disregard of the "special duties" owed to Mr. Tamez as the guarantor of TPB's obligations to the Selling Defendants, and the high degree of probability that their false and intentional inducements, misrepresentations, deceit, and concealment would inflict emotional harm upon Mr. Tamez, proximately caused Mr. Tamez to suffer severe emotional distress.

151. Defendants' recurring conduct, acts, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

39

152.    Pursuant to N.C. Gen. Stat. § 1D-15(a), each Defendant is properly liable for punitive damages in this action in that each Defendant is liable for compensatory damages and has committed one or more aggravating acts justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior and specific instances of willful and wanton conduct.

153.    The recurring conduct, acts, negligence, and impropriety of Defendants were willful, wanton, malicious and in reckless disregard for the rights and interests of Plaintiffs and justify an award of punitive damages.

154.    As a result of the above, in addition to punitive damages, Plaintiffs seek from Defendants, jointly and severally, actual damages including, without limitation, damages resulting from loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss, and as to Mr. Tamez, without limitation, loss of familial relations and severe emotional distress in an amount not less than US$70 Million to be proven at trial.

## COUNT FOUR

## FAILURE TO WARN

155.    Plaintiffs incorporate the allegations as set forth in Paragraphs 1-154 of this Complaint as if fully set forth herein.

156.    Under N.C. Gen. Stat. § 99B-5, Defendants are liable for negligent failure to warn and inadequate warning or instruction, in that they were each a manufacturer or seller of a product who acted unreasonably in failing to provide such

40

warning or instruction. The failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought.

157. As a manufacturer or seller of a product, Defendants had a duty to disclose through adequate warnings or instructions the risks of harm associated with the Trucks operation in Mexico with double-articulated trailers and a GCW of 75.5 tons.

158. At the time the Trucks left the control of Defendants as manufacturers and sellers, the Trucks, without an adequate warning or instruction, created an unreasonably dangerous condition that Defendants knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to Plaintiffs in Mexico, a reasonably foreseeable claimant.

159. In addition, after the Trucks left the control of Defendants, they became aware of, or in the exercise of ordinary care should have known, that the Trucks posed a substantial risk of harm to a reasonably foreseeable user or consumer, including Plaintiffs, and failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

160. Defendants knew that the failure to provide adequate warning or instruction would induce Plaintiffs, who were unaware of the risks of harm explained above, to purchase the one hundred and five (105) Trucks.

161. As a result of the above, in addition to punitive damages, Plaintiffs seek from Defendants, jointly and severally, actual damages including, without limitation,

41

damages resulting from loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss, and as to Mr. Tamez, without limitation, loss of familial relations and severe emotional distress in an amount not less than US$70 Million to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered in their favor as follows against Defendants, jointly and severally:

1)      Pursuant to Count One (Fundamental Breach Under CISG Article 25), full compensation including, without limitation, compensation for loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss suffered by Plaintiffs proximately caused by Defendants, in an amount not less than US$70 Million to be determined at trial;

2)      Pursuant to Count Two (Fraud Including Fraudulent Inducement, Fraudulent Misrepresentation, Fraudulent Deceit, and Fraudulent Concealment), compensatory damages including, without limitation, compensation for loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss suffered by Plaintiffs, plus damages suffered by Mr. Tamez's loss of familial relations and severe emotional distress, proximately caused by Defendants, in an amount not less than US$70 Million, plus punitive damages, to be determined at trial;

3)     Pursuant to Count Three (Negligent, Willful, Wanton, and Reckless Misrepresentation, Deceit, and Concealment), compensatory damages including, without limitation, compensation for loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss suffered by Plaintiffs, plus damages suffered by Mr. Tamez's loss of familial relations and severe emotional distress, proximately caused by Defendants, in an amount not less than US$70 Million, plus punitive damages, to be determined at trial;

4)     In Count Four (Failure to Warn), compensatory damages including, without limitation, compensation for loss of past and future profits, loss of goodwill, loss of use, loss of time, inconvenience, loss of value, and commercial loss suffered by Plaintiffs, plus damages suffered by Mr. Tamez's loss of familial relations and severe emotional distress, proximately caused by Defendants, in an amount not less than US$70 Million, plus punitive damages, to be determined at trial;

5)     Pre-judgment and post-judgment interest and any other costs, expenses, or fees to which the Plaintiffs may be entitled by law; and

6)     Award Plaintiffs all such other and further relief as is just and proper.

## **JURY DEMAND**

Plaintiffs respectfully request a trial by jury of all claims so triable.

Respectfully submitted,

_____
Eric C. Rowe (NC Bar # 10713)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, N.W., Suite 450N
Washington, DC 20036
Tel:  202.659.6787
Fax: 202.689.3164
Email:  erowe@wtplaw.com


_____
Charles H. Camp (DC Bar # 413575)
(*Special Appearance To Be Filed*)
Law Offices of Charles H. Camp, P.C.
1055 Thomas Jefferson Street, N.W.,
Suite M200
Washington, D.C. 20007
Tel: 202.457.7786
Fax: 202.457.7788
Email: ccamp@charlescamplaw.com

*COUNSEL FOR PLAINTIFFS*
*TRANSPORTES PEÑÓN BLANCO S.A.*
*DE C.V. and*
*GERARDO ANGEL TAMEZ TAMEZ*

44